HERITAGE VILLAGE OWNERS ASSO-
CIATION, INC., a Colorado nonprofit
corporation, Plaintiff–Appellee,

v.

GOLDEN HERITAGE INVESTORS,
LTD., a Colorado limited partnership;
Townhomes Heritage, LLC, a Colorado
limited liability company; and WW Con-
struction Management, Inc., a Colorado
corporation, Defendants–Appellants.

No. 02CA0985.

Colorado Court of Appeals,
Div. I.

March 11, 2004.

Benson & Associates, PC, Jesse Howard Witt, Arvada, Colorado, for Plaintiff–Appellee.

Godin & Baity, LLC, Edward J. Godin, Darrell D. Collett, Denver, Colorado, Defendants–Appellants.

Opinion by Judge MARQUEZ.

In this construction defects case, defendants, Golden Heritage Investors, Ltd., Townhomes Heritage, LLC, and WW Construction Management, Inc., appeal the judgment in favor of plaintiff, Heritage Village Owners Association, Inc. We affirm.

The Association is the homeowners association for Heritage Village, a sixty-three-unit townhome community. Defendants were involved in the development, construction, and sales of that community.

The Association filed a complaint alleging numerous construction defects in both individual units and common areas. The amended complaint included claims for negligence per se, negligence, breach of implied warranty, deceptive trade practices in violation of the Colorado Consumer Protection Act (CCPA), and negligent nondisclosure or concealment.

The trial court ruled on the Association's motion in limine that the Association has standing under the Colorado Common Interest Ownership Act, § 38–33.3–101, et seq., C.R.S.2003 (CCIOA), to assert construction defect claims for individual owners' units, as well as for the common areas. The Association presented evidence of damage in individual units resulting from water intrusion at windows and structural defects in exterior decks and floor slabs.

The jury found for the Association on all claims and determined damages in the amount of $3,618,000. After trebling damages, the trial court entered a judgment for $9,879,000 plus interest, costs, and fees. The trial court later entered an amended judgment. This appeal followed.

I.

Defendants first contend that the trial court erred in finding that the Association had standing to assert claims for construction defects in both the individual units and the common areas. We disagree.

The CCIOA was enacted in part to establish "more certain powers in the association to sue on behalf of the owners." Section 38–33.3–102(1)(b), C.R.S.2003. These powers are enumerated in the statute: "[S]ubject to the provisions of the declaration, the association, without specific authorization in the declaration, may ... [i]nstitute, defend, or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the common interest community." Section 38–33.3–302(1)(d), C.R.S.2003.

The "common interest community" is defined as "real estate described in a declaration with respect to which a person, by virtue of such person's ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of

other real estate described in a declaration." Section 38–33.3–103(8), C.R.S.2003.

Section 38–33.3–103(30), C.R.S.2003, defines a "unit" as a "physical portion of the common interest community which is designated for separate ownership."

## A.

■ Defendants contend that the CCIOA does not grant standing to assert claims related to windows, decks, and floor slabs because these claims are not matters affecting the common interest community. Citing § 38–33.3–103(5)(b), C.R.S.2003, which defines "common elements" as "real estate within a planned community owned or leased by an association, other than a unit," defendants assert that the Association has standing only to assert claims for matters affecting the "common interest community" outside the individual units. We disagree.

Here, the trial court ruled before trial that individual units are part of the common interest community property and thus, the Association had standing to assert claims on behalf of the homeowners for defects to individual units. While this appeal was pending, a division of this court decided *Yacht Club II Homeowners Ass'n v. A.C. Excavating,* —— P.3d ——, 2003 WL 22722946 (Colo.App. No. 02CA0645, Nov. 20, 2003), which holds that (1) § 38–33.3–302(1)(d) confers standing upon associations to pursue damage claims on behalf of two or more unit owners with respect to matters affecting the "common interest community," and (2) individual units are part of the common interest community.

We conclude that the CCIOA's plain language including individual units in the common interest community and *Yacht Club* make clear that the Association has standing to assert claims of individual unit owners.

## B.

■ We also reject defendants' assertion that the Association's Declaration of Covenants, Conditions, and Restrictions denies the Association any responsibility for or interest in windows, decks, and floor slabs of individual units.

■ Under the CCIOA, a homeowners association's standing to institute litigation does not require specific authorization under a declaration. *See* § 38–33.3–302(1)(d). Further, "[i]n the event of a conflict between the provisions of the declaration and the bylaws, the declaration prevails, except to the extent the declaration is inconsistent with this article." Section 38–33.3–203(3), C.R.S. 2003.

We read § 38–33.3–203(3) to provide that the CCIOA prevails over any inconsistent provision in the Declaration.

Here, defendants point to sections of the Declaration apportioning maintenance duties between the Association and the owners of individual units. However, the Declaration specifically states that "declarant submits the Property to the provisions of the [CCIOA]" and that the Association has all the "powers, authority and duties permitted under the [CCIOA] which are necessary and proper to manage the business and affairs of the Community." Provisions stating that the Association and individual owners have separate maintenance duties under the Declaration have no bearing on the Association's standing under the CCIOA.

## C.

We also disagree with defendants' assertion that pursuant to *Villa Sierra Condominium Ass'n v. Field Corp.,* 787 P.2d 661 (Colo. App.1990), the Association lacked standing to assert a claim for breach of the implied warranty of habitability.

In *Villa Sierra,* a division of this court held that a condominium owners association had associational standing to assert a claim for breach of implied warranty for damage to areas under common ownership, but stated that lawsuits seeking damages on behalf of individual owners would normally require the participation of those owners.

However, *Villa Sierra* was decided before the CCIOA was enacted, and here, defendants do not argue that the plain language of the CCIOA excludes the breach of implied warranty claim. Nothing in the plain language of the CCIOA or in the rationales of *Villa Sierra* or *Yacht Club II* precludes the

Association's standing for the breach of implied warranty claim. *See Yacht Club II Homeowners Ass'n v. A.C. Excavating, supra* (reversing trial court's ruling that *Villa Sierra* prevented homeowners association's standing under CCIOA in negligence claim).

## II.

■ Defendants also contend that the trial court erred in ruling that the proper measure of damages was cost of repair rather than diminution of value. We disagree.

■ The selection of the appropriate measure of damages in each case is within the discretion of the trial court. The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered. *Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309 (Colo.1986).

Different measures of damages, including the cost of restoring the property to its original condition, may be appropriate under certain circumstances if the actual loss suffered is to be fully compensated. *Bd. of County Comm'rs v. Slovek, supra.*

Here, in ruling that the proper measure of damages was the reasonable cost of repairing or rebuilding the property, the court explained that the townhomes were livable and determined that it would be inappropriate to "base a measure of damages on diminutions or arbitrary increase in the market value over the period of time for homes that ... both sides have stated or presented to the jury are in need of repair."

Defendants concede that the trial court had discretion to apply a measure of damages other than diminution in value, but argue that doing so in this case was economically wasteful because the Association's damage estimate of approximately $6.5 million exceeded defendants' original construction cost. We are unaware of any authority that imposes this test for economic waste. *See Bd. of County Comm'rs v. Slovek, supra* (refusing to impose a damage cap that would prevent repair cost damages greater than original value when repair costs are not wholly unreasonable and evidence demonstrates that payment of market value likely will not adequately compensate property owners for personal or other special reasons).

We conclude that the trial court did not abuse its discretion in determining that cost of repair would best compensate the Association.

## III.

■ We also disagree with defendants' contention that the trial court erred by excluding testimony of defendants' real estate appraisal expert as to the appreciation in value of individual townhomes.

■ Rulings on the relevancy of proffered evidence are within the sound discretion of the trial court and will not be disturbed on review absent an abuse of discretion. *KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769 (Colo.1985).

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. CRE 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. CRE 403.

Here, the trial court ruled that defendants' expert could not testify as to appreciation in value of individual units in the townhome complex. However, because the Association had introduced evidence of the length of time units were on the market when up for resale, the court allowed defendants' expert to testify about sales performance.

Because we have already concluded that the court properly determined the measure of damages to be cost of repair, we need not address defendants' assertion that testimony as to appreciation is relevant to determine diminution of value. Further, we disagree with defendants' assertion that the trial court erred in not admitting evidence of appreciation as relevant to the reasonable cost of repairs.

The trial court determined that market values had "nothing to do" with the damage and repairs to the townhomes. The court

held that even though such evidence "could" be relevant, it would be inappropriate under CRE 403 to "bring in an additional factor," in part because the increase in market values was arbitrary and attributable to the overall "astounding growth" in the local real estate market.

Relying on *Gold Rush Investments, Inc. v. G.E. Johnson Construction Co.*, 807 P.2d 1169 (Colo.App.1990), and *Summit Construction Co. v. Yeager Garden Acres, Inc.*, 28 Colo.App. 110, 470 P.2d 870 (1970), defendants argue that awarding cost of repair damages without considering market values necessarily constitutes unreasonable economic waste. We are not persuaded.

In *Gold Rush Investments*, a division of this court addressed whether evidence was sufficient to support an award for diminution of value in a hotel already in use. The division pointed out that if physical reconstruction would involve unreasonable economic waste "by destruction of usable property or otherwise," damages should be measured by reduction in market value. *Gold Rush Invs., Inc. v. G.E. Johnson Constr., supra*, 807 P.2d at 1174. The jury's award was supported by evidence that even with repairs, the hotel's useful life would be shortened, and costly continuing repairs would be necessary.

Here, no similar evidence was offered. The court told defendants that should the jury return a verdict that defendants felt was excessive, the court would address the issue as a matter of law. However, the damages returned by the jury were less than half of the $6.5 million cost estimated by the Association for repairs to both individual units and common areas combined.

In *Summit Construction*, contrary to defendants' assertion, the trial court did not fail to consider market value. The court determined that repairing certain construction defects in the floor and roof would entail unreasonable economic waste and that market value was the proper measure of damages. However, in the absence of evidence from either party of the property's market value, the court improperly assessed damages for the deficiencies in the roof and the floor

partly on a percentage of the cost and partly on the cost of repair.

Nor do we agree with defendants that the proffered testimony was relevant to rebut the Association's claim that the units were "not of merchantable quality."

While the Association's complaint included an allegation that defendants knew or should have known that their negligence would result in structures not being of merchantable quality, the Association sought as damages only the cost of repairs, not additional compensation for reduced market value after repairs. *Cf. McAlonan v. U.S. Home Corp.*, 724 P.2d 78 (Colo.App.1986)(affirming instruction directing jury to measure damages to residential property as the cost of repair *plus* any diminution in market value as repaired).

Finally, we disagree with defendants' assertion that the Association opened the door through testimony of its witness to difficulty in selling units, their extensive time on the market, and failed transactions due to the construction defects. The trial court properly allowed defendants' expert to rebut that specific testimony, but because the Association's witness did not testify as to sales prices, defendants' expert likewise could not do so.

### IV.

■ Defendants next contend that the trial court erred by failing to instruct the jury that a finding of deceptive trade practices would result in an award of treble damages under the CCPA. We disagree.

Section 6–1–113(2), C.R.S.2003, of the CCPA provides in relevant part that a person who engaged in a listed deceptive trade practice shall be liable for the greater of:

(I) The amount of actual damages sustained; or

(II) Five hundred dollars; or

(III) Three times the amount of actual damages sustained, if it is established by clear and convincing evidence that such person engaged in bad faith conduct.

Here, the trial court refused defendants' proposed jury instruction informing the ju-

rors of the availability of treble damages because the trebling was by statute and thus was not a finding of fact to be made by the jury. We perceive no error.

Colorado appellate courts have not addressed whether jurors should be instructed that violations of the CCPA may result in an award of treble damages. Colorado trial courts regularly award treble damages after the jury has separately determined liability. *See, e.g., Giampapa v. Am. Family Mut. Ins. Co.,* 64 P.3d 230 (Colo.2003)(No–Fault Act); *Itin v. Ungar,* 17 P.3d 129 (Colo.2000)(rights in stolen property statute); *Anson v. Trujillo,* 56 P.3d 114 (Colo.App.2002)(CCPA).

However, two Colorado cases have addressed jury instructions on treble damages under a statute governing seizure of personal goods. Neither case required the court to inform the jury of statutory trebling provisions, but both cases held that the court may instruct the jury on treble damages. *See Sandberg v. Borstadt,* 48 Colo. 96, 109 P. 419 (1910); *Wymond v. Amsbury,* 2 Colo. 213 (1873). The supreme court in *Wymond* also noted that "single damages may be returned" and "the court may, when the facts will warrant it, enter judgment for treble the amount so returned." *Wymond, supra,* 2 Colo. at 217.

Defendants urge us to adopt the reasoning of *Wanetick v. Gateway Mitsubishi,* 163 N.J. 484, 750 A.2d 79 (2000), which held that the jury should be instructed as to the availability of treble damages under New Jersey's Consumer Fraud Act. However, the decision in *Wanetick* was not unanimous. The dissenting justice wrote that "knowledge that the judge will treble the economic damages is not only irrelevant to the jury's performance of its function, but such knowledge likely will be prejudicial to the plaintiff while at the same time thwarting the legislative intent of requiring exemplary damages." *Wanetick v. Gateway Mitsubishi, supra,* 750 A.2d at 86–87 (Coleman, J., dissenting). We find the reasoning of the dissent persuasive and decline to adopt the majority's position.

Federal courts have held that instructing the jury on treble damages is improper under other statutory schemes. *See HBE Leasing Corp. v. Frank,* 22 F.3d 41, 45 (2d Cir.1994) (district court should not as a general matter permit reference before a jury to the fact that any eventual award will be trebled under the Racketeer Influenced and Corrupt Organizations Act).

While defendants rely on *Bordonaro Brothers Theatres, Inc. v. Paramount Pictures, Inc.,* 203 F.2d 676 (2d Cir.1953) (addressing treble damages provision of the Clayton Act), the *HBE Leasing* court held: "[T]ime has passed by the *Bordonaro Brothers* decision, and the dominant and more-reasoned view is that juries should not be made aware of trebling provisions." *HBE Leasing, supra,* 22 F.3d at 46. The *HBE Leasing* court also pointed out that *Bordonaro Brothers* did not hold that excluding such testimony required reversal.

Similarly, at least three other federal circuits decline to inform juries of trebling provisions of the Clayton Act in antitrust cases. *See Brooks v. Cook,* 938 F.2d 1048 (9th Cir. 1991); *Pollock & Riley, Inc. v. Pearl Brewing Co.,* 498 F.2d 1240 (5th Cir.1974); *Semke v. Enid Auto. Dealers Ass'n,* 456 F.2d 1361 (10th Cir.1972)(jury's function is to determine the amount of damages, not the amount of the judgment). *But compare C. Albert Sauter Co. v. Richard S. Sauter Co.,* 368 F.Supp. 501 (E.D.Pa.1973); *Sablosky v. Paramount Film Distrib. Corp.,* 137 F.Supp. 929 (E.D.Pa.1955), *with Rea v. Ford Motor Co.,* 355 F.Supp. 842 (W.D.Pa.1972), *rev'd on other grounds,* 497 F.2d 577 (3d Cir.1974)(split in Third Circuit).

The federal courts declining to inform juries of treble damages note that reference to trebling is irrelevant to questions of liability and damages, may tend to confuse or prejudice a jury into reducing its eventual award, and frustrates Congress's goal of deterring improper conduct. *See HBE Leasing Corp. v. Frank, supra; Pollock & Riley, Inc. v. Pearl Brewing Co., supra; Semke v. Enid Auto. Dealers Ass'n, supra.*

■ The purposes of the treble damages provision of the CCPA are to provide prompt, economical, and readily available remedies against consumer fraud and to promote private enforcement. *Showpiece Homes Corp. v. Assurance Co.,* 38 P.3d 47

(Colo.2001). These purposes are similar to those of the acts addressed by the federal courts. *See Pollock & Riley, Inc. v. Pearl Brewing Co., supra* (purpose of treble damages is to deter violations and encourage private enforcement); *Semke v. Enid Auto. Dealers Ass'n, supra* (same).

In view of the early Colorado Supreme Court cases and the absence of statutory direction, we do not deem it necessary to determine whether a jury may never be advised of treble damages. However, we conclude that the trial court did not err by declining to instruct the jury of the trebling provision of the CCPA.

The judgment is affirmed.

Judge TAUBMAN and Judge WEBB concur.